Take your time. Our third case is Jyll Brink on her own behalf and on behalf of those similarly situated versus Raymond James & Associates, Case No. 16-14144. My name is Eric Sodi and I have the pleasure of representing Jyll Brink and the putative class members in this case against Raymond James. The district court below erred by finding that Raymond James' misrepresentation that any of its customers who participated in its passport account program would not be charged a commission and that the processing fee that they were charging their customers was not a commission was material and found to be made in connection with the purchase or sale of a covered security under the Securities Litigation Uniform Standards Act. This case, at least to me, and I speak for myself only and not for my colleagues, really comes down to a question of line drawing and a very difficult one at that because it seems to me you've got a pretty good argument given the facts alleged in this case and given some other circuit precedent. But what happens if the misrepresentation concerns a charge that is equal to the purchase of the security? In other words, you buy $10,000 worth of a stock, you get charged $10,000 as the commission. Is that material? I think that you have to look at the context in which it arises. For example, there are cases out there. The broker says, hey, listen, you're going to get charged $10 per trade. And then all of a sudden, you're getting charged dollar per dollar the exact amount of stocks that you bought. So instead of being charged $10 for buying $10,000 worth of stock of IBM, you're charged $10,000. And so now you're $10,000 in the hole before you've even started to try to play the stock market. Is that material? I think that under those factual circumstances, Your Honor, it could be material. Okay, well, you're going to have the same problem in my view that your opponent is going to have because I'm going to draw the line for him somewhere else. And so where do you draw the line if the issue concerns the length and the depth of the misrepresentation? I don't think that you can draw a line, a bright line rule. I think you do have to look at every situation a little bit differently. All right, so in the context of your argument, when you've got nine and a half minutes, tell me what the legal principle is that we can comfortably apply in this case and then comfortably apply in crazy scenarios like the one that I laid out for you. I think that you have to take the reasonable investor standard that was used in both Feynman and Apert. And you look and you say, would a reasonable investor consider that representation or that misrepresentation to significantly alter the total mix of the information available when making their investment decision? And I think that if you, to use the court's example, if they're told that they're only going to be charged a $10 fee and they're charged a $10,000 fee, then yes, I do think that there's a problem there. However- So then does it depend only on the amount of the overcharge? No, it does not necessarily just depend on the amount. Again, you have to look at everything that's at play here in each case. So for example, in this court's opinion in Goebel, a $5 million misrepresentation, and it's a different context. It was in an SEC enforcement case. That was found to be not material because of the nature of the misrepresentation. There, the misrepresentation was as to the financial strength and condition of a particular brokerage firm. So you look at the nature of the misrepresentation in our case. The misrepresentation was not that they would not be charged $30, but how that $30 would be split. These folks, whenever they made a trade, they went into the trade knowing that they would be charged $30 for the processing fee. So that analysis that they did was already there. The question becomes if they knew how that was going to be split is different than what they were promised. Your complaint alleges that they knew exactly what they were going to be charged and that there was no misrepresentation about that? No, Your Honor. The complaint alleges that they were charged $30, that was, they did know that was going to be the charge. What they did not know was that a big portion of that was going to be put into Raymond James' pocket. So your contention, okay, you're telling me the complaint says that, point blank, that they knew that they were going to be, they were charged X, but they knew they were going to be charged X. Their only concern and their only problem is that they were not told the truth about where that money was going. I don't know off the top of my head if the allegation is they knew they would be charged $30, but we certainly don't allege that they did not know they would be charged $30. But where does that come from then? Because there's a difference, it seems to me, even if you use the reasonable investor standard. And again, I'm talking only for myself. If a client knows the amount of a charge and the alleged breach of contract or negligence of fraud, only concerns a misrepresentation about where that money is going to be disbursed, like to a subsidiary, to the board of directors, to someone else, to a slush fund, whatever, then I can see why you have a decent argument that it's not material because in monetary terms, the investor knows $30 is coming out of my pocket, right? Yes. And I would have paid it anyways. It's just a question of them lying to me about where the money went. That is correct. But if your argument is, not only is that a problem, but I didn't know that I was going to get charged $30 or get charged $50 when the actual processing cost was really $3 to $5, that's a different case. So which is your case, or which one is your case closer to? I think our case is closer to your first analysis, and that is these folks knew, and we don't allege in the complaint that they didn't know they were going to be charged the processing. You didn't allege that they didn't know? We did not, again, I don't know off the top of my head if we specifically said they did know the $30, but we don't dispute that, and I don't think the complaint anywhere suggests that we do. What they are saying is that that $30 and the way that it was distributed, and the way that they were told it would be distributed, was what was misrepresented to them. And that had they known the difference, would a reasonable investor have figured that the significant mix of information available had been altered? I don't think so, Your Honor, and I appreciate the Court's question on that, because it is an issue, and as the Court pointed out earlier, this particular case and the facts of this case are a little bit easier than that, because we are not doing this blindly. We have two circuit courts that have already addressed it, both the Second and the Seventh and Fineman and Apert, and I think that in those two opinions, and particularly Apert, I think Apert is on all four with the facts of this case. Well, let me say, this is the way the District Court described it, and the District Court may have gotten this wrong, too, so we'll have to take a very careful look, but the District Court, in its order, described it as a claim that Raymond James took a disguise commission by charging an excessive per-transaction processing fee. Yes, Your Honor. Did the District Court get that wrong? No, that is true. So, the allegations are that Raymond James charged a processing fee. Let me take a step back to try and give that statement context. The allegations are that the passport account agreement says, you will not be charged commissions, but you will be charged an advisory fee of 1.5% of your account, payable quarterly. That's to replace commissions. The passport agreement goes on to say, you will also be charged a processing fee, and the processing fee will be used to cover the execution and clearing expenses of your trade. There is a line in the ... Per-transaction. Per-transaction, Your Honor. Okay. And there is a line in the passport agreement, and I quote, it says, processing fees are not commissions. They are to defray the cost associated with trading and execution of customers' trades. So, you are arguing that you were charged too much. I am arguing that we were charged $30, and we were told that none of that was going to be a commission. No, but you just told me that ... That's why I'm having trouble with this case, conceptually and factually. You just told me that they were charged more than what the passport account document said, because the $30 was more than the cost associated with clearing the transaction. Well, the passport agreement has a schedule and says, you are going to pay $30 for an equity trade. Now, that amount changed in April of 2012 to $995, but there is a schedule right there, and everyone sees it, and everyone knows it, but where the misrepresentation occurs is when they tell you what that passport fee, what that processing fee is going to be used for. They tell you, or they tell their customers that it is going to be used for one thing, and that is execution and clearing cost for the trades. In reality ... The actual net cost to Raymond James, or the costs that you use in normal accounting terms of what goes into an input for a company. In other words, you need a human being, or at least a human being operating a computer to execute a trade, and you need lights and electricity to be able to do that, and you aggregate all those costs, and you attribute them over the course of a year to different sorts of transactions. Well, and there has been discovery on that, but for purposes of today, we allege that it costs them, their actual cost to execute and clear is no more than about $5 or $6, so the actual pocketed commission, that they, again, they know they are paying the processing fee. They know it. They just ... And they knew that they were paying a $30 processing fee. A $30, whatever the scheduled fee was, yes, but they were told in writing in their contract that it is not a commission, and as it turns out, based on the allegations and the complaint, at least a portion of it was, and that's what the case, this case, is about, and that's why we believe the Apert case and the Feynman case are right on point, that no reasonable investor would consider not knowing how that money is split, or that, to use the words of Feynman and Apert, the brokers are pocketing some of the dollars would be material to their decision to engage in a financial investment decision. If we agree with you that the claim is not precluded, what do you think should happen next? What should the court do? Well, I think if this court reverses, and I assume, Your Honor, talking about the district court, I think the district court then moves on and deals with the class certification issue, and I believe there's a summary judgment pending that it will have to deal with, but the case would continue on as not being precluded. What about the jurisdictional issue? Well, I think the jurisdictional issue would be over. The inquiry would be answered by this court, and SLEUSA does not apply. You haven't properly pled jurisdiction. You're going to have to amend your complaint at some point. I would assume the district court would have to allow you to do that. You can't plead residency as opposed to citizenship. That is correct, Your Honor. That did come up in this proceeding for a moment, but yes, we would ask that either this court or the district court grant us leave to amend and change the word resident to citizen and also include a couple of concrete examples of citizens in different states, which we now have after discovery. I see my time is up. You've saved your full time for rebuttal. Thank you very much. Thank you, Your Honor. Good morning, Your Honors. Good morning, Mr. Braver. Dan Braver, along with my partner, Calvin Hayes, on behalf of RJA, I know the . . . That's a challenging name. Thank you. You've got to get ready. The first question that I'm sure is going to come out, which was addressed by Your Honor, the essence and the heart of the complaint, and the judge got it right, is that they claim that the processing fee that they were charged was an undisclosed, unauthorized, hidden commission when the complaint says that she wanted a commission-free account. On the other hand, according to Mr. Sondy, the schedule of the account indicates that they knew they were going to get charged this amount. The contract says that for a period of time, certain transactions, and there will be a processing fee on each transaction, will be $30 or $50 in a period of time, and that was for execution and clearing of a trade. What she is claiming about, from day one, that that was a misrepresentation because she didn't want a commission account, she wanted a commission-free account, and what that $25 is on a $5 charge, if that was the actual cost, which they claim, their theory that's where the fraud is from the beginning, or it's $45 if it was a $50, that was, as they've described, and you know under the Security Litigation Uniform Standard Act, what you look to is not the allegations of the complaint, but what the complaint is about. It doesn't have to be a fraud theory, or a fraud claim, as long as it's a fraud theory. And what they've said is- I'll grant you that, that it's a fraud-based claim, but that doesn't answer everything. Well- You still have to keep going. Absolutely, absolutely, and I'm going to- So if there's, so let me flip the tables on you. Sure. If you had a case where the allegation was that you were being charged one cent more than actual cost per processing fee, would that be material? I don't think that that would be material in that- Why not? Because when you look at what this circuit has done in the quintet of cases of Goebel and Morgan Keegan and Merchant and Carib Air, what you're looking at is whether this information would affect a reasonable investor's decision. Is it useless? Is it trivial? Would it alter the mix? So it depends on the amount of the overcharge? In part it does, but you have to look at the value of what the claim is. Here, what we have- We have to look not only at the amount of the overcharge, but the amount of the transaction in question? No. When I talk about value, it's going to the heart of what the representation is. They were told you're not going to be charged a commission, and then because they have a million clients, they're going to nickel and dime everyone to death, and they're charging everybody a cent commission, and they figure nobody's going to see it, and over the course of years, we're going to make a bundle. When you look at- Is that material? I don't think the one cent in terms of what this court's precedent- A dollar. A dollar. I think that the court would say with respect to this transaction, with a dollar, I think a reasonable investor, would that alter the mix? No, but a thousand percent markup, which is what they claim, or to the tune of millions and hundreds of millions of dollars, which is the allegation here, in a commission-free account, would that, with a reasonable investor, when I entered into this saying it was to be a commission-free account, and I wanted not to pay any commission relative to any of my trades, would I alter my- If you're buying millions of- if you're the really wealthy, wealthy investor, and you're buying almost institutional-type blocks of stock, that's material to you, too? In other words, you're buying $20 million of stock at a pop, and you're being charged $30 instead of five. That's material to you? The issue, it might be, if they answered the question, is what was the alleged fraud? Here it is a thousand percent markup in terms of the transaction. What a reasonable- this court doesn't make- it's blind as to whether it's a million-dollar investor or it's a ten-million-dollar investor or a hundred-dollar investor. The test is, under the circuit supported by the Supreme Court precedent, is when you look at that, is that information trivial, useless, or to the decision, would it alter it? And here, when you're given that information, I'm told I'm not going to pay any commission. But you're told you're paying a processing fee. You're just being- $30. You're just being denied, allegedly, truthful information about what that consists of. But you know you're paying it, and you enter into the account knowing that that's going to be a cost and a drag on your earnings. So how can it be material? With respect to- I mean, you know that if you buy $1,000 worth of IBM stock, you're going to pay 30- assuming the schedule said $30- you're going to pay $30 for that transaction, right? You know that going in. That said, there's going to be a $30 execution fee. And you know that going in, and nevertheless, you signed up with Raymond James, and you decided to ask him to execute a transaction for the purchase of 1,000 shares of IBM stock. And part of that representation, that contract, was I am not going to pay any profit. I'm paying an advisory fee. This is a profit-free, non-commissioned account, and according to the essence of this complaint, that's the fraud. Well, how is that likely to affect your trading behavior? You know it's $30. You know that's what it's going to cost you. So how the money is split up can be a breach of contract or a fraud claim, but it's not material to a reasonable investor. Well, the issue is, is it information as to whether or not, in this case, when you are paying a profit at that level of 1,000% market, we're not dealing with the $1 or $2 pocketing. And when you go back and look at the cases that they refer to, the Apert case and the Fineman case, what the court said is a $1 pocketing going to make that profit, is that going to affect a reasonable investor's decision? Would it make a difference? Is that useless or trivial to them? This court says, when you look at it and you have the district court saying, this is significantly higher. Wait, wait, wait. Slide the microphone over a little bit because we're losing you a little. I'm sorry, Your Honor. When you have the district court, Judge Demetrioulas got it right. He said when you're dealing with something that is so significantly higher than the actual cost, that is something that would affect the analysis and that impacts a reasonable investor. So where do you draw the line? What's significantly higher to affect a reasonable investor? Same question I asked Mr. Soddy. I think that the line... What principle do we articulate in this case that a future panel of this court will comfortably apply to the different factual scenarios that have been bandied about here? I think the principle, Your Honor, that you can apply, and again, we're dealing with an objective standard. It's a precedent that this court has set in terms of what you look at in terms of materiality is when you balance those factors. When you look at one cent, going back to your example, or you look at one dollar in connection with what is the import of the claim. The import of the claim here is non-commissioned and a different fraud. Each case is going to have a different set of alleged fraudulent behavior, or in this case, facts that would create a fraudulent theory that brings it under Sluice's remedial purposes. When you add that and look at that, in which Judge Demetrioulas said, I'm looking at a dollar in your pocket of a reasonable investor, because that's an objective test. That's a factual analysis that the judge, he or she has to look at when she's looking at the facts of the case. Here, I'm dealing with something that's just hitting us right in the face under their claims. It's a hitting the face sort of test? Objective standards. How do you look at that and say, is this trivial? A 1,000% markup is 500% markup. That's what I'm trying to figure out from you. I'm saying to you, your honor, the . . . I write an opinion, Judge Pryor writes an opinion, Judge Reeves writes an opinion that says a misrepresentation by a broker-dealer with regards to commissions paid on a transaction are material when, fill in the blank. When they affect a reasonable investor's decision, was this useless? I know, but that's a useless standard. Well, I . . . It's beautiful in the abstract, but it tells you nothing going forward, because you have to then apply that standard and give it some substance to apply it to this case. I'm trying to get help from both of you about how to fill in the rest of that picture. I think that Judge Demetrioulas told us that when it is significantly higher, when there is truly a line beyond no impact at all, a dollar, when you look at that, but here you have 1,000%, you have something that is significant in the decision, totally divorced from what the understanding of this investor was. She's told us, she's actually told us that the most critical material, the thing that affected my decision, it was going to be no commission. The hidden commission is the most material misrepresentation. When you have to consider it in the context of what the alleged, in this case, fraudulent theory is, I wanted a profit-free account. Would one cent do it? No. Would a dollar? If we're going to look to the Second and Seventh Circuit for help when you write this opinion, but when you can say it's significantly higher, it's moved past something that has no recognizable impact, the penny, the dollar. Do you take into account the volume of the trade itself in looking at significantly higher or not? Or is it just the actual misrepresentation limited to its four corners? I think all of the cases that have addressed this look at the actual misrepresentation within the four corners. I don't think you can do Monday morning quarterbacking because we don't want artful pleading and we don't want the remedial purposes of this statute being triggered by how many pieces of stock or shares of stock somebody buys. You look at, I believe, at the time, what is the underlying claim? What is the heart of what we say is the fraudulent misrepresentation? Here is I don't want a profit. We have guidance. We have what I don't think is appropriate precedent, but we have a dollar or two, but we're well It seems to me that your argument means that any overcharge under a brokerage agreement, as long as it reaches some level, some amount, would be material. Isn't that the logical reason for your argument? No, I don't think that's logical. Here we have something as an overcharge can be as a result of many things. Here, this is not an overcharge. You were supposed to pay 30, you paid 50. Here is I did not want to pay any profit. I'm willing to take the execution and clearing costs. It's represented. It's marketed. I'm told, I think, when we get to the in connection with the test, which I'll get to in a second because that's the other part of what you have to look at, since there are only two elements of SLUSA that are on appeal here, take it in context of that fact. It's the theory here, not that I was overcharged. I wasn't supposed to pay any profit, any commission. Now I'm told, as the client says. Well, let me rephrase my question. Any charge that I think I wasn't supposed to pay is material when it reaches some amount that we think is reasonable. You have to go back and analyze what we're told by the Supreme Court, what we're told by this court. You have to analyze the underlying claims to see whether or not this is an artfully pled fraud claim. You can't set a standard of what is an artfully pled fraud claim until you look at the complaint that's brought before you. Judge Demetrioulas was dealing with this set of facts. Our motion to say dismiss it because this is under SLUSA and very competent lawyers, truly enjoyed the respect, the professionalism, and they're very smart. I think what we have here is an artfully pled, that's why SLUSA's there, a securities fraud claim masquerading as a processing fee. Judge Reeves, I think, had a question. I'm sorry, Your Honor. Quick question. I don't want to take all your time, but it seems to me from a practical standpoint that if we disagree with your argument on materiality, you've essentially proven part of the claim that the plaintiffs will have to prove if the case goes back. You've essentially acknowledged materiality. Well, they failed to prove, or we proved, both elements that this was material and it was done in . . . it was a misrepresentation or omission of fact in connection with the purchase of a covered security in a material way. So they blend. There's no question that there's overlap, but you can . . . you still have to meet the materiality element. So if you found that it was in connection with the purchase of a security but not material, then . . . and we don't . . . we think Judge Demetriou has got it right, and that, unfortunately for us, we would say would be the wrong appellate decision, but you would have . . . you have to look at both. And as it relates to the in connection with . . . well, let me just . . . the in connection with . . . because I only have seven and a half seconds. It's okay. Go ahead. You can take an extra minute. Okay. Let me just wrap it up. Relative to this precedent, this court is guided by four or five cases. I call them the quintet of cases from this circuit that says on materiality, it's simple. Is this something that is either useless or trivial and would not impact the decision? And it isn't a . . . with respect to picking a broker, because your GOBLE says if it's only that, then it's not material, but here it goes to the heart. So in connection with the purchase of sale of securities, we have Supreme Court precedent going back to Zanford. This court followed it at Instituto and Dabbert that says you can do in connection with the purchase and sale of covered securities two ways. One, is there an enticement, an inducement, a fraud? Or do we have a fraud that intersects, connects, nexus to, in terms of coinciding? Judge Dimitriolos appropriately said that here, every time there was a transaction, that processing fee was part of that and bundled up into that. They wanted a purchase of covered securities without that in profit, any commission, and it's here. It's inherent in each one of the transactions. So it does make a difference. It's connected to it. That's the nexus. I think, Your Honor, when you look at the complaint, and if you go back to paragraphs 36- You need to wrap up. Yes, sir. If you go back to paragraphs 36-38, and they attach and exhibit E, which is marketing materials, you can also satisfy the inducement test. Obviously, what they're alleging is they were induced into this transaction by fraudulent misrepresentations. I mean, that's my characteristic of the underlying essence of the claim, that there wouldn't be a commission. They did. They've made these purchases. They would not have purchased any covered securities if they knew that they were going to pay a commission, a profit. So we believe that Judge Dimitriolos got it right on both counts. Those are the only two issues before you, materiality. It would make a difference, and two, it was in connection, the fraud coincided. Thank you, Your Honor. All right. Thank you very much, Mr. Braver. Stephanie, can you give them an extra minute, please? Thank you. Your Honor, I did want to discuss the in connection with element, but first I wanted to address the Court's concerns, numerous concerns about the materiality element of this. You had posed a question, a theoretical question that suggests a standard. When a overcharge is blank, it is material, and I would fill in the blank, at least for the record, and to borrow words from Judge Pryor, when it's likely to affect the trading behavior of a reasonable investor, and in this case, it's not material. I would fill in that blank with when you know the fee, just not how it's broken up and how it's being spent. Your Honor, we did say that they knew they were paying the $30 in paragraph four of the complaint. We even reproduced the schedule of the charges that were known to be charged in paragraph 39 of the complaint. I did want to touch very briefly on the in connection with element because, again, there's two here. There's materiality and there's in connection with. I just, finding a reversal on either one of those elements is all that I need for Slucid to be found not to apply, and I think that the five cases that counsel talks about are, in fact, some of the cases that apply here, but they don't like the Supreme Court's opinion in Trois. Trois was the most recent statement by the Supreme Court on the in connection with requirement, and in Trois, and I know that Mr. Braver suggested there's some overlap because in Trois they did say that in connection with for purposes of Slucid is a connection that matters, and a connection matters when the misrepresentation makes a significant difference to someone's decision to purchase or sell a covered security. But then, but if that's the case, then you've made both the materiality and in connection with standards exactly the same. Well, one of them talks about- That can't be right. Well, no. They are both, they both have materiality, but the first, the materiality requirement is the materiality as to whether or not they're going to enter into the transaction, whereas the in connection with materiality is whether or not the misrepresentation connects the level of connectivity to a transaction in secured, or in covered securities. Are those two things any different? Well, because one goes to a reasonable person's state of mind as to the nature of the misrepresentation, the other goes to the connectivity that particular misrepresentation has to- As an actual matter? No, no, as a reasonable person. So they both have reasonable person standards, they both have materiality, they both deal with the transaction, they seem to me one and the same. There is some overlap there, Your Honor, I do admit that, I will say this. Why is it- Troyce is a good example of it, though, because- Why isn't a good way of looking at this just very practically, that if you're dealing with the purchase of securities, and you're dealing with fees, commissions, charges associated with the purchase of a security, how can that possibly not be in connection with- Well, it's the very essence of the transaction, you're not getting it for free, even when you use online trading platforms, you're paying something. How can that fee, that charge, that commission not be in connection with a transaction for securities, when you're only having to pay that fee or commission or charge when you purchase securities? Because it's not the fee itself, but the misrepresentation made concerning the fee that has to be made in connection with a covered security transaction. To give you an example, if Raymond James had promised these class members, you know what, we're going to send you a trade confirmation on recycled paper, and then decided that we're not going to send it, and sent it on regular paper, it would be the same argument. Under their analysis, that would be made in connection, you don't get a trade confirmation unless you actually purchase or sell a security. I know, but those that don't have to do with a charge per transaction. Well, and this doesn't have to do with anything related. This misrepresentation is made well before these transactions occur. This was made at the time when they decided to- But if you never have a transaction, you can never sue. If you never have a transaction, the fee is never incurred, but it's the misrep- And you can never sue. So it's only a misrepresentation that has the necessary causal elements if you execute a transaction, right? I think that you have to have, you don't get charged the processing fee unless you execute a transaction. So it has to be in connection with- Well, I don't think it is. Again, it's not the charging of the fee, it's the nature of the misrepresentation. But that misrep, in other words, the misrepresentation is not actionable unless you have a transaction. And if you look at it in that sense, it has to be in connection with a transaction. Unless the misrepresentation is material to that transaction occurring, yes. Troyce is an example where it was not. In Troyce, the misrepresentations were that, buy Stanford CDs. They're great CDs, they're very liquid, and they're backed by market-grade securities. The court found that was material, but it was too far removed from the actual purchase of a covered security to be in connection with. Why was that in that case? Because what was happening there is the CDs themselves are not covered securities. The allegations were that they would be backed by covered securities. Right, because you weren't purchasing a covered instrument in that case. Correct, and some were purchased, very minimal, but it was basically just an embezzlement case just like Zanford. Okay. Okay, Mr. Sordi, thank you very much. We appreciate the argument on both sides. We're in recess until tomorrow morning.